When you're ready, Mr. Atkinson. In this court, my name is Tim Atkinson, appearing here on behalf of the appellant, Pason Systems, Inc. In order for this court to affirm the judgment that is on appeal, this court will have to find that the plaintiff presented sufficient evidence of a liberal infringement. The issue cannot be decided under the doctrine of equivalence. Despite this court's suggestion in 2006, when this case was last before it, that the case might be amenable to a doctrine of equivalence analysis, given the differences in the technologies involved, the plaintiff was ambivalent about that. Their ambivalence was clear all the way through the conclusion of the evidence in the trial, in the portions that we've cited on page 50 of the opening brief, where on the night before trial, it was unable to point the court to any equivalence that it intended to assert in closing. Notwithstanding an over-objection, the court allowed the doctrine of equivalence to go to the jury. But as a result of that ambivalence, Your Honor, the plaintiff was unable to point the court to any material in the record that meets the test of particularized testimony and linking argument that the accused device performed substantially the same function in substantially the same manner. Did you object to the jury's instruction? Aye, we did. We objected to the doctrine of equivalence going to the jury, Your Honor. Maybe I'm wrong. Didn't you have your own jury instruction on DOE? Well, we did, but at the time of the jury conference, in the light of the evidence, and having earlier moved for JMOL on the issue of infringement, Your Honor, we raised it with the court that there had been no evidence of infringement and didn't feel it was appropriate to instruct the jury in that regard. At that point, at page 1606 of the record, the court queried counsel for the plaintiff and said, yeah, what do you intend to argue here? They said, well, we'll think about it tonight and decide tomorrow. And he said, all right, I'm going to let it in. But there's a colloquy on 1605, 1606 of the appendix that sets forth the discussion on that. We had initially proper doctrine of equivalence instruction in anticipation of not knowing what evidence was going to come in at the trial. Rule 51 requires you not only to just object, but you've got to state distinctly the matter objected to on the grounds. Can you show me in the record where you did all that? I believe if you look at page 1605, and page 50, actually page 50 of our opening brief provides the site to where the discussion with the court occurred. And what does that say? I'm going to have to dig through a stack to find it. Well, the first point was that the equivalence argument was applying only to claim one, right? Well, there are two sections there. Well, that was a concession by National Oil Wells Council. You're right. The equivalence argument really applies only to claim one. And that was on the original, or at the time of the original motion for JMOL. And then in response to plaintiff's objection to the doctrine of equivalence instruction, the court then queried what particular equivalence are you going to be arguing. And they responded, we'll think about it and let you know in the morning. So the objection actually occurs on the page of the record prior to the 1606 site there. Your Honor, respectfully, the doctrine of equivalence would have been consumed within the motion for JMOL that we made at the conclusion of the plaintiff's evidence. It also would have been. Did Perkins give some testimony on equivalence? Well, I think that's an important testimony to look at. If you look at the long portion of the testimony that they cite supposedly in support of their doctrine of equivalence argument, it appears at page 48 of the red brief. And there is a generalized description based on basically a training video based on auto-driller that had been shown. And then a very general description of the device in general. It doesn't go through on a limitation by limitation basis any of the specific claims and particularly not claim 14. It doesn't come anywhere near close to the quantum quality proof that was present in the Pace case that they cite, where if the court looks at exhibit 71 in Pace, there was actually a chart that was presented under the rubric of the doctrine of equivalence analysis that goes through and points out how substantially the same means, function, and results were obtained. If the best they can come up with is a non-claim-by-claim limitation analysis of the doctrine of equivalence based on a general description in a training video, Your Honor, we believe that that does not meet the test that this court has required repeatedly from Lear, Siegel, Nesser, and Malta as recently as text instruments going forward. I'm still looking at 1605, and I see you raising a question as to are they even going to argue equivalence. And then the court asks them later, are you going to argue equivalence? And they say, yes, we certainly are. I don't see you then saying, well, that can't be part of this case. I don't see an objection to the jury being interrogatory at any point. Well, Your Honor, I believe that that objection certainly would have been subsumed within the JMOL motion, both the one that was made at the conclusion of the evidence and at the JMOL motion that was not allowed to be argued at the conclusion of the plaintiff's case. I think the statement that the court is looking at is we don't believe that they've presented evidence on the doctrine of equivalence. The court basically agreed. They said, well, we'll tell you tomorrow. And the judge at that point said, well, then I'm going to let the instructions out. The court says, what are you going to argue? And then you guys start talking about what's going to be argued to the jury. There's not an objection saying, we objected this jury instruction. Here's the specific reason why. And there's nothing of that character, is there? Yeah. Well, no, Your Honor. I believe that we do, prior to that call up, we say we object to the doctrine of equivalence instruction going to the jury, because we don't think we've heard any evidence on it. What happens if we were to decide that there was sufficient evidence in front of the jury to sustain a verdict of literal infringement? Then the doctrine of equivalence issue would obviously go away, Your Honor. I mean, if there was not, it was a general verdict. Aren't we entitled to review the record for precisely that question? Absolutely. And we invite the court to do exactly that. We believe that. But if we were, I mean, it seems to me that you really ought to be making your argument liable. You just told me that you ought to be going after literal infringement with both barrels blazing. Because if you can't convince us that their jury was wrong, could not have found literal infringement, your CME argument vanishes. I understand completely, Your Honor. And I just wanted to make sure that we could take doctrine of equivalence off the table. Notwithstanding that, I don't think there would be enough to sustain a doctrine of equivalence verdict or the right to inquire. But literal infringement, that's exactly where they fell down. And there are a number of places in which they fell down relative to claim 14. But probably the most critical of which is that they lost track of the signal that needed to be produced in response to changes in drilling fluid pressure. And the relaying of that signal is a defined term to a drill fluid control. And you've done plane construction disputes that are lying under your infringement argument, right? Well, there's one that pertains to a different step of claim 14. I don't believe there are any plane construction disputes before the court on the issue of whether or not the accused device produces a second signal or relays that second signal as it was defined by the court in a plane construction that is not on dispute before the court. And it's real simple. The device itself starts out with the acquisition of a measurement of different parameters, one of them being a bit weight. Bit weight measurement comes clean to the device. The device then produces a signal related to drilling fluid pressure on one side, bit weight pressure on the other side. It needs to produce a signal that represents only changes in that parameter that it's examining. That would be bit weight over time and in reference to a set point. That's the processing that takes place in the regulator and the perverted embodiment or the processing that needs to take place in terms of an infringing device. At one point, Mr. Brett, your expert, is asked a question. Mr. Brett, you talked about a filtered signal. Do you stand by your testimony that the filtered signal is sent, that that is the only signal representing either the change and there's no other signal besides that signal? I think so. Doesn't he admit infringement there? He does not. Because in order to understand that testimony, the court needs to understand what was meant by the term filtered signal. And actually, he had talked at length at pages 1620 to 1640. Well, he seems to be saying the filtered signal is going back. It's the same thing. My words are sitting there. That's what I think I hear. A couple of points. There is a signal that is acquired, filtered, and sent to the auto driller for processing. So a filtered signal is sent and then processed in a fashion that does not meet the limitations of the claim. And that is the signal, if any, that is then relayed to the drill string controller. And so the ambiguous use of the phrase sent, sent from where to where. There is a filtered signal that is sent into the processing unit that is then materialized. Is there anywhere in the record where you come back on cross-examination and say all that you're telling us now? There is 10 pages after that. Well, actually, five pages in front of the section that they're citing there. So one question recrossed. There is the direct question. Can the auto driller, does the auto driller, send a signal representing only changes? But you now realize what we're doing is talking about facts that the jury has to find. Well, but your honor, sent, disconnected, is not meeting the plaintiff's burden. And this is an issue on which they had a burden of chasing this signal through the various steps of Claim 14. They had the burden to meet that. Instead of doing that, they asked an ambiguous question that, frankly, in context, doesn't mean a darn thing until you can find that it was actually generating the signal that was required there, of which they cite absolutely nothing, and sending that signal or relaying that signal to a drill string controller. Both those things are missing. Do you want to save your rebuttal time, Mr. Atkinson? I will, your honor. Thank you. Thank you. Mr. Raley? May it please the court. I would like to first address a couple of questions asked by the panel of Mr. Atkinson. First, he's basically making his new trial argument regarding the equivalence issue. And his motion for new trial, which is before this court, is that the jury instruction on equivalence and literal infringement said, is there infringement under either of the two, and defined them. As the court noted, there is no objection to this instruction by Paison at trial. Therefore, any argument about it is waived, according to Federal Rule 51. And, your honors, there is plenty of evidence of both literal infringement and infringement under the doctrine of equivalence. And this court cannot really speculate as to which the jury found. We've laid them out in our briefing. They're literal infringement. We have the Autodriller User Guide. Trevor Holt's Algorithm Summary and Testimony, that's a Paison representative. We have Greg Perkins, our expert's, interpretation to the jury of those things, and also using the Autodriller in the courtroom to show how it met each of the elements of Claim 14. Under equivalence, we have the Autodriller training video, again with Greg Perkins, talking about how the Autodriller works, what its function is, the way that it works, the means that it works, the result that it achieves. Now, Judge Mache very clearly said that we could not ask our expert of ultimate opinions, such as, does it function in substantially the same way? He would not allow that. But what he would allow is evidence of how the thing worked. That's what the jury heard. And the site for that, no ultimate conclusions, is 8596. The other issue that Senator Atkinson just raised has to do with the signal. And let me get right to that. This is an argument for reversal. And their argument is that there is no evidence that the second signal represents only changes in bed weight. Now, this term only was a claim construction term requested by Payson, which is not before this court, because we won the case. But the court might want to be aware that this term, which is a term of exclusion to narrow the patent, was rendered and given to the parties after we, the plaintiffs, rested our case. We were able to make our case anyway, in large part, through cross-examination of Payson's witnesses. But even before that happened, Greg Perkins, our expert testified, in this suit, and this is on page 81556, will the pressure signal represent only changes in drilling fluid pressure? It would have to. And then, it's very clear, according to Trevor Holt's algorithm summary, weight on bed and pressure work the same way. Jay Portbret, Payson's expert in the court, just referenced this site. The filtered signal, he admits, on page 81551, is the only signal representing changes in pressure or changes in bed weight. This is the evidence that the jury heard on cross-examination of Payson's witness. Here's what all this means. The auto-driller has an algorithm. It's a formula. It doesn't change. It has control constants. So, a measurement of the hook load sensor, which becomes weight on bed, and from the pressure transducer, which is a measurement of pressure, is sent and they are compared to a set point and this formula is applied. But since the formula doesn't change, the only variable is the weight on bed or the pressure signal. So, what comes out as a control is a signal that represents changes in weight on bed and changes in pressure. And the reason that word represents is so important is, contrary to what Mr. Atkinson is saying, the claims don't say said second signal is the exact same number as changes in bed weight. It says represents. It stands for. Just like the cruise control of a car. The cruise control of a car doesn't know what mile per hour means. It knows what throttle means. And so it takes a mile per hour and it applies a formula or an algorithm and it sends a signal to increase or decrease the throttle. This auto-driller works the same way. That's the way 142 patent works. That's the evidence the jury found. So, the word represent is key here. And both sides' experts agree on this. What you're hearing is argument of counsel. But the evidence from the jury box is from J. Ford Brett, Greg Perkins, Trevor Holt. They all agree that the signal is the only signal. So, those are really the two things that Mr. Atkinson raised. Why did this case take about 10 years? Oh, I'll tell you why, Your Honor. Thank you. I mean, I know it's been up and down. But at the end of the day, and I know it went to a jury. It wasn't a summary judgment. But it seems a little remarkable to me that... And it's extremely frustrating to our client. Nearly 10 years. This suit was filed in 2003. Immediately it was sent to re-examination. Validity was confirmed. It was stayed during that process. It took a while for a trial setting. How long did that take? Over two years. But we had trouble getting a trial setting. When we finally got a trial setting, we won a unanimous verdict of infringement, of willful infringement, and that Payson did not let their burden show in validity. And they put in another re-exam. And using a lot of the same arguments that they made at trial and lost. And so, what you see here is, how long did the second re-exam take? Two more years. So, there's four years in re-exam. And... So, then we have a bench trial. And they made the same validity arguments again, this time under the guise of an equitable conduct. So, what's gone on here, Your Honor? And I haven't talked about willful infringement yet. But the evidence is quite strong that they ignored and disregarded and discounted the emails from their patent counsel that they were infringing. And they infringed willfully two years post-jury verdict. When their own people admit that with a push of a button they could have changed the algorithm. And you see in this case, no analysis by the court of the willfulness facts. He talked about whether validity is a close call. But those are the validity arguments made by trial counsel years later. Have nothing to do with the feelings and the thoughts of Payson at the time they ignored the emails. But isn't that what our case law encompasses? Seagate and the cases that followed it. Yes. That there was an objective prong. So, you're talking about the subjective prong. No, no, no. The objective prong encompasses the arguments that he made to the court in the closeness of the case. My apologies to the court if I seem to mistake that. Of course, that's correct. And the jury was properly instructed on the Seagate standards. My point is that there really is no evidence supporting those standards on behalf of Payson. They just ignored them. They ignored the warnings of their counsel. And so, at a minimum, there should have been some analysis, I would think by the court, of these facts in deciding not to enhance damages and not to award attorney's fees because it seems that if ever there was a case justifying them, this would be it. They have stalled it for 10 years now. The patent expired a month ago. There's no chance of an injunction ever. They've made millions and millions of dollars. Willfully... Is there anything against the law that they wanted to re-exam twice? No, no. It's just been a... The stall business. I mean, seeking an administrative remedy. It's kind of the way they did it. Just kind of paint a picture of these folks are bad guys, what I think you're trying to tell me. And I'm not impressed with that. I mean, they have a right to go to re-exam if they want to. If I could respond, Your Honor. Of course, anybody has a right to re-exam. It's kind of the way they did it. Their first re-exam, they used Varney as prior art because their patent lawyer told them that that is the closest prior art. They lost. They took their best shot with the closest prior art. They lost. They went to trial. They raised all kinds of other prior arts, ten different ones. They lost that, too. Their own expert said that those things were different. They filed another re-exam post-verdict with all that prior art that they lost at a trial. Now, at some point, these re-exams over and over and over again, you start to wonder how... Claim 14 is kind of like old Ironsides. It's taken all these cannonballs to the hole and it keeps going. This is now the eighth time they've argued. Well, this is the seventh time they've argued and the eighth time the validity has been tested overall and it's still going strong. So, I believe that they've solved the proceedings with these re-examinations. That's my personal belief, Your Honor. I'm sure reasonable minds could differ on that. That's not a factor for often the objective factor in willfulness, right? I understand that. I mean, in fact, it kind of cuts in their way, right? At least it's suggesting that they had some belief that there was some real problem with the patent. Yes, but to meet that, the belief must be reasonable under the circumstances. And if they're losing over and over and over again and they're being told by juries and trial courts and the PTO that their validity arguments make no sense, hold no water, and their own expert admits on the witness stand that this prior art is different, at some point you wonder whether the CK standard is met. That's my submission, Your Honor. I'm happy to answer any questions of the court rather than just opine. Okay, thank you, Mr. Wrayley. We've reserved a little bit of time, Your Honor. And if the willfulness issue comes up, you can come back. Thank you. Mr. Atkinson. Your Honor, I would very much, as you're looking at the issue that is important to the infringement analysis, take a look at precisely what was cited in 596. The judge, in this case, does certainly have his own way of trying cases and is pretty certain about it in terms of what motions he will accept or consider and so forth and so on. He made a statement that an expert could not testify as to the ultimate conclusion of infringement, but the predicate items relative to establishing infringement literally under the doctrine of equivalence for chasing a signal from the point of its original acquisition through its processing from a relay to a drill screen controller are not questions that the court closed down. They're simply questions that were never posed. It should have been a simple enough matter for Mr. Wrayley to stand up here and tell the court, here in these three sections are where I went through a witness either adversely or directly and established the production of the signal that relates only to changes in weight on bid and the relay of that signal to find a set second signal to a drill screen controller. That, in a record of an eight-day trial, should be about the easiest thing, like pulling off a lock. The fact that he's using bail references taken out of context, I think, should be enlightening to the court that this is one of those rare cases in which there simply was not sufficient evidence that came before the jury to justify a finding that they did. Your Honor, I will, because it has come up addressed briefly, the willfulness issue. We think that the court made detailed findings on exactly what the factors are. I do want to correct one misimpression, and that is we did not move for a stay after the secondary examination. The judge imposed that sua sponte over the objection of both plaintiff and defendant. We were not looking to drag this case out for 10 years. It's a long time for both sides of the case of litigation. Your Honor, there was some touching on the issue of obviousness as we raised it in our brief, and I think it's important to clarify that the issue of obviousness was really tried through our direct presentations and through an expert in their cross-examination without any rebuttal testimony whatsoever. As it came down, each and every element of Claim 14 was exposed in some aspect of the prior art. In fact, each and every element of Claim 14 was exposed within the Dillon patent itself from some 60 years earlier than the 142 patent. What changed with regard to that was that the Dillon patent and the difference that was pointed out repeatedly was that the Dillon patent and some of the earlier patents didn't provide for continuous proportional release of the drill string. That's what they did differently with an on-off switch or some measured approach rather than continuously and proportionally responding. The Ball patent, however, did. Do you have a final thought for us, Mr. Atkinson? I do, Your Honor. We believe that this is a case that was lacking in evidence on many fronts and I carefully look at the records and we'll be able to do the first report that should be released. Thank you. Thank you. Mr. Raley, there was reference to localness. That's all we can talk about at this point. I understand, Your Honor. If I could, just as a matter of record, remind the Court he's just made a validity argument. I won't address it except that we have a motion to strike at this time on certain aspects of that and also we have outlined in our briefing that that is waived because there was no 50-day motion on validity. So I won't address that unless the Court wants me to, but that's all in our briefing. Regarding willfulness, Your Honor, the evidence is very clear that they were informed by their patent counsel that their design infringed. And these are e-mails. The CEO of Payson was examined in deposition and a trial on that. I misunderstand. I don't have a jury verdict. There was a verdict of willfulness. Yes, Your Honor. So they infringed willfully. Yes. Our cross-appeal, Your Honor, and this is why I'm here on the button. Cross-appeals for enhanced damages. Yes, and attorneys' fees. And basically that the Court did not address the closeness of willfulness. He talked about validity. Isn't this a discretionary matter? Yes. Help me understand why three of us sitting here in Washington would question the discretion of one of our colleagues who sat through the whole trial. The point is the case law strongly suggests, Your Honor, indeed requires, that the Court, the trial court, he is at liberty, of course, to deny enhanced damages and attorneys' fees. It's a discretion. But he should at least evaluate the willfulness facts in his or her opinion in making that denial. You're not saying calling it a close case is giving some kind of an evaluation? He said it was a close case on validity, but he didn't say it was a close case on willfulness and the validity arguments that he used in making that were ones made by Mr. Atkinson at trial years after the email. There's absolutely no afterwards. I'm sorry. It's your position that in evaluating enhanced damages you look at the closeness of the willfulness? Yes, Your Honor. The closeness of subjective prong or the objective prong? Well... I'm not understanding. You don't think the objective prong under Seagate and subsequent cases goes to the closeness of the merits case? Of course I do, Your Honor. Okay, then. But on the subjective prong, what they knew at the time is somehow important. Yeah, but to say the closeness of the case, if he was talking about the validity case, that's entirely proper under the objective prong, is it not? Under the objective prong. You're correct, Your Honor. But under the subjective prong, what they thought at the time is significant. And there's no evidence whatsoever that they thought of any other prior arguments. You've got to win on both prongs, right? Excuse me? You've got to win on both prongs. That's what I'm thinking, yes, Your Honor. And the trial judge is saying, I'm kind of kicking the one leg of the stool out from underneath the objective prong. I understand, Your Honor. But our point, and obviously, we have passion about this. I appreciate your passion. Yes, Your Honor. But let me make one point. Your recitation of the horrors that you've been exposed to, all of these useless re-exams, almost to the point of bad faith. As far as I can tell, the only member of the judiciary who's seen this up close and personal from the day long to the end was Judge Mage. And so he can feel whether or not he thinks these circumstances are such so that your client is entitled to enhanced damages, right? I can tell you that we've got a claim construction after we, the plaintiffs, arrested, narrowing our patent significantly. We had some concerns about that. But, you know, we fought hard, and we won our case, mostly on cross-examination. But we're here, and yes, of course, we feel some passion about it. But we wonder whether or not, if not this case for enhanced damages, or at least attorney's fees, even the post-verdict, willful infringement, when they could have stopped it with a push of a button, knowing that re-exams had failed, at some point you have to wonder, if not this case, what case, if any? That's our work. Thank you for your time, Your Honor. I'm happy to answer any other questions if you have any. Thank you very much. Thank you.